IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MICHAEL ORR,

    **Plaintiff**,

        **v.**

MICHAEL MUKASEY,

    **Defendant.**

**CIVIL NO.** 06-1775 (FAB)

## OPINION AND ORDER

BESOSA, District Judge

Trial in this case began June 30, 2008 and terminated on July 14, 2008. The jury returned a verdict in favor of plaintiff Michael Orr ("Orr") against the defendant Michael Mukasey, the former United States Attorney General, in his official capacity. (Docket No. 121) The Court entered judgment the following day. (Docket No. 122) Following the Court's entry of judgment a bevy of post-judgment motions were filed.

On July 29, 2008 Orr filed a motion for equitable relief in which he requested that the Court order the U.S. Marshals Service to offer him the position of GS-15 Chief Deputy United States Marshal, make payment pursuant to the Back Pay Act, and to issue an order affirming that Orr's rights were violated. (Docket No. 127) Mukasey opposed this motion on September 2, 2008. (Docket No. 141) Orr replied on September 7, 2008. (Docket No. 146) Mukasey filed a surreply on September 12, 2008. (Docket No. 158)

On July 30, 2008, Mukasey filed a motion for judgment as a matter of law pursuant to Rule 50. (Docket No. 128) On August 7, 2008, Orr opposed Mukasey's Rule 50 motion. (Docket No. 130) Mukasey replied on August 18, 2008. (Docket No. 133)

On August 26, 2008, Mukasey filed a motion for remittitur or, in the alternative, for a new trial on the issue of damages. (Docket No. 138) Orr opposed this motion on October 8, 2008. (Docket No. 166) Mukasey filed a reply to Orr's opposition on October 22, 2008. (Docket No. 178) Aside from filing an opposition, Orr attacked Mukasey's motion for remittitur or a new trial in two ways. First, because Mukasey's motion for remittitur or a new trial was filed after the Court granted two prior motions for an enlargement of time, Orr moved the Court to reconsider its second grant of an enlargement of time for failure to comply with Rule 60(b). (Docket No. 136) Mukasey opposed Orr's motion for reconsideration on September 1, 2008. (Docket No. 140) Orr replied to Mukasey's opposition on September 2, 2008, (Docket No. 143) and Mukasey filed a surreply on September 12, 2008. (Docket No. 157) Second, on November 3, 2008 Orr filed a motion to strike Mukasey's motion for remittitur. (Docket No. 179) In addition, Mukasey stated that he had mistakenly referenced the wrong rule of federal procedure in his reply to Orr's opposition to the motion for remittitur. Therefore, Mukasey moved the Court for leave to file an amended reply on November 12, 2008. (Docket No. 180)

Unsurprisingly, two days later Orr opposed Mukasey's motion to amend his reply brief.  (Docket No. 181)

On May 27, 2008, Orr filed a motion for attorneys' fees and costs.  (Docket No. 139)  Mukasey opposed Orr's motion for attorneys' fees and costs on September 22, 2008.  (Docket No. 162) Orr replied on October 2, 2008.  (Docket No. 165)

For the reasons provided below, the Court **DENIES WITH PREJUDICE** defendant Mukasey's Rule 50 motion (Docket No. 128); **DENIES WITH PREJUDICE** defendant Mukasey's motion for a remittitur (Docket No. 138); **ORDERS** the reduction of the jury's compensatory damages award to $300,000.00 pursuant to 42 U.S.C. § 1981a(b)(3)(D); **GRANTS** Orr's motion for equitable relief and awards him back pay and matching payments into Orr's thrift savings plan (Docket No. 127); **GRANTS** Orr prejudgment interest on the back pay award; **ORDERS** defendant Mukasey to **reinstate** Orr at the **GS-15 level** retroactive to May 3, 2001 **no later than July 27, 2009** in a position mutually agreed upon by defendant Mukasey and Orr; **ORDERS** the parties to submit to the Court the amount of back pay due Orr, the pre-judgment interest due him on the back pay amount, and the amount of matching payments due to be made into Orr's thrift savings plan; **DENIES** as **MOOT** Orr's motion to reconsider the Court's grant of an enlargement of time to file a motion for remittitur; **DENIES** as **MOOT** Orr's motion to strike the defendant's motion for

remittitur; **DENIES** as **MOOT** defendant's request to amend its reply brief; and **DENIES WITHOUT PREJUDICE** Orr's motion for attorney fees.

**I.   The Rule 50 Motion**

    **A.   The Rule 50 Standard**

        Rule 50(a) permits courts to grant a motion for judgment as a matter of law once a party has been fully heard on an issue if the court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]" Fed.R.Civ.P. 50(a)(1).  Where, as here, the Court does not grant a Rule 50(a) motion prior to submitting an action to the jury, the movant may file a renewed motion for judgment within 10 days after the entry of judgment.  Fed.R.Civ.P. 50(b).  Mukasey has done just that.

        The United States Supreme Court has held that when "entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record.  In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. at 150-51 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  A Rule 50 movant must shoulder a "heavy burden." White

v. New Hampshire Dept. of Corrections, 221 F.3d 254, 259 (1st Cir. 2000) (quoting United States v. Scharon, 187 F.3d 17, 20 (1st Cir. 1999)).   Evidence  supporting  a  verdict  may  be  entirely circumstantial, and it need not exclude every hypothesis contrary to  the  verdict;  "that  is,  the  fact-finder  may  decide  among reasonable interpretations of the evidence."  Id.  A court may only grant judgment as a matter of law when "the evidence, together with all  reasonable  inferences  in  favor  of  the  verdict,  could  lead  a reasonable person to only one conclusion, namely that the moving party was entitled to judgment."  Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 22 (1st Cir. 2002) (quoting Lama v. Borras, 16 F.3d 473, 477 (1st Cir. 1994)).

Mukasey  argues  that  Orr  failed  to  prove  that  he  was subject to discrimination based on his national origin and that he failed to prove that he was retaliated against after submitting an EEO complaint.  Mukasey also requests that the Court order a new trial because the discrimination claim and the retaliation claim were  included  in  the  same  verdict.   These  arguments  are  weak. Rather than address all of the evidence put forth at trial, Mukasey exhibits a "selective memory" by referencing only certain evidence in his Rule 50 brief that supports his theory of the case.  This tactic will not sway the Court because, as indicated above, the Court must focus on whether the totality of the evidence submitted allows  a  reasonable  factfinder  to  find  as  the  jury  did,  not  on

whether a myopic review of evidence only favorable to the movant favors an outcome contrary to the verdict.

**B.   The National Origin Discrimination Claim**

Focusing on just the national origin discrimination claim, Mukasey argues that Orr failed to "present solid evidence of discriminatory animus toward continental Americans" and that Orr failed to demonstrate that Mukasey's non-discriminatory reason for cancelling the job announcements for Chief Deputy U.S. Marshal was pretext. Mukasey then goes on to focus on evidence presented that is favorable to his defense. His brief references the following evidence: (1) Orr was promoted to the position of Assistant Chief Deputy Marshal effective January 3, 1999 during Herman Wirshing's tenure as U.S. Marshal; (2) human resources specialist Katherine Mohan and former Acting Director of the U.S. Marshals Service Louis McKinney testified that Wirshing would have had some input into the decision to promote Orr; (3) Mohan and McKinney testified that the multi-tiered process for selecting a candidate and cancelling a job announcement was designed to eliminate arbitrariness and the presence of discrimination from the selection process; (4) Orr's witness Andres Jimenez testified that he believed that Orr's difficulties in the District of Puerto Rico were caused by Deputy U.S. Marshal Juan Donato and not by Wirshing; (5) documents written by Wirshing after Orr left on detail to be the Chief Deputy Marshal for the Virgin Islands and on his return to Puerto Rico mentioned

Wirshing's disappointment with Orr for failing to show interest in the District of Puerto Rico during Orr's detail to the Virgin Islands; (6) Wirshing was aware that Orr applied for positions in the continental United States and that Orr had expressed a preference for a posting in Michigan; (7) Mukasey presented three witnesses who are continental Americans (current U.S. Marshal [and former Chief Deputy U.S. Marshal] Esteban Soto, Herman Brewer, and Ed Lassiter), who all testified that Wirshing had not exhibited any discriminatory animus toward continental Americans in their presence and that Wirshing had in fact aided them in their careers; and (8) the person who was ultimately hired to fill the Chief Deputy position in the District of Puerto Rico after the third posting of the position was a white, continental American, like Orr.  The Court agrees with Mukasey that all of the evidence referenced above could allow the fact-finder to draw the inference that Wirshing did not discriminate against Orr on the basis of his national origin.  None of that evidence, however, requires the fact-finder to make that determination when considered alongside other evidence from which an inference of improper discrimination can be drawn.  That is the situation here.

        The following is a summary of just some of the evidence in the record that the jury could have relied upon to determine that Orr was the subject of intentionally discrimination based on his national origin by cancelling the second posting for the Chief

Deputy position.  See Chadwick v. Wellpoint, Inc., 561 F.3d 38, 45 (1st Cir. 2009) ("plaintiff[] must present enough evidence to permit a finding that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias.")  (quoting Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 31 (1st Cir. 2003)).

> **1.    Wirshing waits until Orr temporarily relocates to the Virgin Islands to post the Chief Deputy opening**

Orr testified that on July 21, 1999, when he was working as the Assistant Chief Deputy in Puerto Rico, in charge of the Fugitive Task Force, Wirshing told him "chiefs come and go here, they never stay more than two years" and that "it will always be like that until we get one of our own in here and not one from the outside."  This statement allows a finder of fact to infer that the U.S. Marshal preferred Puerto Ricans over non-Puerto Ricans for the Chief Deputy position.  It also allows for certain inferences to be drawn concerning Wirshing's subsequent actions.  In September of that same year, Orr found out that the then Chief Deputy (Esteban Soto) would leave the district; Orr wrote to Wirshing to express his interest in the Chief Deputy position.  Instead of replying to Orr's letter, which he never did, Wirshing asked Soto to find out if Orr was interested in accepting a detail to the U.S. Virgin Islands to serve as the Acting Chief Deputy of that office. Orr testified that when Soto proposed the Virgin Islands detail to

him, he inferred that Soto did so with Wirshing's approval because
Wirshing was Soto's supervisor.  Wirshing approved Orr's detail,
which occurred on September 23, 1999.  That same day, Orr sent
Wirshing a thank you note regarding the detail.  The following day,
September 24 (once Orr left for the Virgin Islands), Wirshing
issued a request for personnel action for the Chief Deputy position
in Puerto Rico.  This sequence of events allows a jury to infer
that Wirshing waited to seek a replacement for the outgoing Chief
Deputy until Orr was out of the office, on a new detail, and
therefore less likely to apply for the position.

> ### 2.   **Wirshing promotes Donato**

On September 28, 1999 Wirshing appointed Juan
Donato, a GS-13 Supervisory Deputy Marshal of Puerto Rican origin,
to the position of Acting Assistant Chief Deputy for up to 120
days.  Andres Jimenez testified that Donato thereafter placed a
placard on his desk with the title of "Chief," not Acting Assistant
Chief.  On December 13, 1999 Wirshing sent a signed memorandum to
all employees in which he stated that he had made Donato the Chief
Deputy, "effective immediately."  Wirshing admitted, on cross
examination, that he did not have the authority to make Donato the
Chief Deputy (a GS-15 position) and that he could not recall why he
incorrectly stated that Donato was the Chief Deputy rather than the
Acting Assistant Chief Deputy.  On December 14, 1999, Wirshing
signed a request for Donato to be noncompetitively temporarily

appointed to the Acting Chief Deputy position for a period not to exceed one year.  This request was improper because the one-year temporary promotion must be competitively awarded, and because it can only go to someone who already had sufficient time in the earlier grade (in this case GS-14), which Donato did not have. Wirshing's behind the scene maneuvering to remove Orr from Puerto Rico temporarily, coupled with his attempt to award Donato an improper double promotion that would allow Donato to act not only in Orr's temporarily vacated position, but also in the vacated Chief Deputy position could be viewed by the jury as additional circumstantial evidence of prejudice.

### 3.    Orr's travel request is denied

On January 8, 2000, while Orr was still in the Virgin Islands, he sent a letter to Wirshing in which he reiterated his desire to interview for the permanent GS-15 Chief Deputy position in Puerto Rico.  Wirshing never replied to this letter; indeed, he didn't communicate with Orr at all during the time that Orr was in the Virgin Islands.  Once the application period closed for the Chief Deputy position, only two candidates appeared on the U.S. Marshals certificate list:  Orr and Steve Armstrong.  On February 9, 2000, a U.S. Marshals Human Resources employee sent Orr an e-mail to inform him that he would interview for the GS-15 Chief Deputy position on February 24-25 in New Orleans, Louisiana.  Orr found out on February 16, however, that his request for funding for

travel had been cancelled.  Wirshing testified that he had nothing to do with the cancellation of Orr's request for travel.  His testimony clashed directly with that of Jose Garcia, a U.S. Marshals Service administrative employee, who testified that Wirshing told him to cancel Orr's request and write on it that no funds were available.  If the jury believed Garcia instead of Wirshing, then it could have properly drawn the inference that Wirshing duplicitously acted against Orr to deny him the opportunity to interview and then lied about it in court.

### 4.    The U.S. Marshals Service cancels the first posting

On February 17, 2000, the U.S. Marshals Service cancelled the posting for the available Chief Deputy position.  Wirshing testified that he was not involved in the decision to cancel the job posting and that he did not know why the posting was cancelled.  His testimony may be seen as conflicting with testimony provided by two others.  Katherine Mohan, who at the time was the human resources specialist for the U.S. Marshals Service, testified that Wirshing telephoned her after receiving the certified candidate list.  She said that Wirshing expressed concern with the two candidates and asked to have the posting cancelled.  Louis McKinney, Special Assistant to the Director, also testified that Wirshing asked him to cancel the posting, which he did.  The jury could have believed the testimony of Mohan and McKinney over that of Wirshing.  This would permit the jury to infer that Wirshing

caused the cancellation of the posting in part or entirely because of an animus that he harbored towards Orr and that he then attempted to cover up his involvement, which could be seen as indicative of a guilty conscience.

**5.   A temporary Chief Deputy announcement is circulated only in Puerto Rico**

On March 2, 2000 Orr filed a grievance, and on March 9, 2000, filed an EEO complaint.  Wirshing found out about the complaint shortly after it was filed.  Several other important things happened at about the same time.  On March 3, 2000, the U.S. Marshals Service circulated a vacancy announcement for a temporary Chief Deputy position (not to exceed one year) only to District of Puerto Rico employees.  Orr, who was detailed to the Virgin Islands at that time, although he remained a District of Puerto Rico employee, was not provided with the notice and therefore he did not apply (at least initially).  The fact that this announcement was only circulated locally and not provided to Orr in the Virgin Islands (although he was still a District of Puerto Rico employee), allows for the inference that Wirshing attempted to keep Orr out of the running for the position.

**6.   The March 9 Task Force Meeting**

Also on March 9, 2000, shortly before Orr was to return from the Virgin Islands, Wirshing held a meeting at the Miramar office of the Fugitive Task Force.  Wirshing testified that he did not recall the meeting.  Jose Concepcion testified that

Wirshing was present at the meeting and that he said during the meeting that he was "fed up with Americans" coming to Puerto Rico to get promotions and then leave.  Robert Sanchez corroborated Concepcion's statement and he also testified that Donato started off the meeting by saying that there was an opening for a supervisor and continued by stating "we are going . . . to take care of our own people."  Andres Jimenez testified that Wirshing said he would use the system to promote only Puerto Rican deputies. The comments attributed to Wirshing and Donato, recalled by three separate witnesses, provide strong evidence of a discriminatory motive against non-Puerto Ricans in regards to promotions within the U.S. Marshals office in the District of Puerto Rico. Wirshing's failure to recall the meeting could have been viewed by the jury as disingenuous given that there was testimony from three witnesses that he was present at the meeting and as to what he said at the meeting.

### 7.  The temporary Chief Deputy position is revealed to be a temporary Assistant Chief Deputy position

On March 17, 2000, after Orr became aware of the temporary Chief Deputy position that had been advertised locally, he contacted Mohan in the U.S. Marshals Service's Human Resources Office to inquire about the position.  Mohan then contacted Wirshing to inquire about the position.  Mohan then called Orr back and told him that the announcement was incorrect and that the posting was really for a temporary Assistant Chief Deputy position;

in other words, the posting was for the same position held by Orr (although his position was permanent).  The purported error in naming the available temporary position could have been seen by the fact-finder as part of a pattern of purposeful conduct, through which Wirshing attempted to promote a Puerto Rican, Donato, over a non-Puerto Rican, Orr, in violation of personnel rules.  Thus, the fact that the locally circulated notice referred to the Chief Deputy and not the Assistant Chief Deputy position may provide additional evidence of discriminatory treatment of Orr.  Such a potential inference could be strengthened by the evidence that Donato was listed as the Chief Deputy in the February organizational chart, that he had moved into former Chief Deputy Soto's office, and that Wirshing viewed Donato as the acting Chief Deputy.

### 8.    Wirshing calls Orr a "fucker" after learning of the EEO complaint

Javier Jimenez testified that during a discussion with Wirshing in March of 2000, Wirshing called Orr a "fucker" and said that Orr had filed a complaint against him.  Jimenez testified that Orr had nothing to do with what he and Wirshing had been discussing at the time, so he assumed that Wirshing simply began talking about Orr because he associated Orr with Jimenez since they were both non-Puerto Ricans.  To state the obvious, Wirshing calling Orr a "fucker" is evidence of animus towards him and in this instance it is related to the filing of the EEO complaint.

This statement alone does not indicate animus based upon national origin, but it may when considered alongside other circumstantial evidence discussed here.

**9.   Orr is belittled and his friends are punished upon his return from the Virgin Islands**

On March 24, 2000, Donato was officially selected for appointment to the one-year temporary GS-14 Assistant Chief Deputy position.  That same day the U.S. Marshals Service posted a new announcement for the permanent Chief Deputy, GS-15 position. Three days later Orr returned from the Virgin Islands detail.  Once back in Puerto Rico, he was issued the worst car in the U.S. Marshals' district fleet, one that had been a reject from a government auction.  He was also immediately reassigned out of the fugitive task force that he earlier lead and was reassigned to the cell block.  This was a task that any junior-ranking deputy in the U.S. Marshals Service could have done; no one of Orr's rank and grade had previously been assigned to the cell block.  Although the reassignment was temporary, Orr did not know that at the time of the assignment.  Orr was also made to report to Donato, who gave him his "performance standards," even though Orr had the superior permanent rank.  Orr testified that Donato ordered him not to talk to anybody except the EEO and his attorney regarding his EEO complaint.  He also testified that Wirshing repeated this order. All of this testimony shows that, upon his return from the Virgin Islands, Orr was treated as if he were a junior-ranking deputy of

the U.S. Marshals Service rather than the second ranking member of the Service in the District of Puerto Rico.  This type of petty behavior by Wirshing and Donato easily supports the inference that they discriminated against Orr and that they retaliated against him for filing the EEO complaint.  It also provides the basis for his hostile work environment claim.

These inferences are also supported by the testimony by various witnesses that Donato repeatedly referred to continental Americans as "gringos" and that he did so in a derogatory fashion. Raquel Bermudez, a Puerto Rico Policewoman who was a member of the Fugitive Task Force also testified that Donato told her not to associate with the non-Puerto Rican deputies.  All of these claims are also strengthened by Jimenez's testimony.

Andres Jimenez testified that Donato approached him and posed a hypothetical question concerning two gangs to him. Donato asked him what he thought would happen to people who support the leader of one gang once that leader leaves and the other gang leader remains behind.  This statement permits the inference that Donato viewed the U.S. Marshals Service members in Puerto Rico as either part of his and Wirshing's team (the Puerto Rican team) or Orr's team (the non-Puerto Rican team).  It also allows for the inference that Donato attempted to get Jimenez to support his team, the Puerto Rican team, over Orr, the non-Puerto Rican, or else.

These inferences are supported by the testimony of Jose Concepcion, a Puerto Rico Police Officer and member of the fugitive task force. Concepcion testified that Donato hassled him because he socialized with his "American buddy," Orr. Andres Jimenez testified that Donato told him that Concepcion was in trouble because he was on the wrong team. Ultimately, Wirshing removed Concepcion from the fugitive task force in November 2000. Donato told Concepcion that he had been removed from the task force, but he gave him no reason for his removal. He also told Concepcion that Wirshing did not wish to speak with him. Concepcion and Orr understood that Concepcion was removed from the task force because of Concepcion's friendship with Orr. The jury could have drawn the same conclusion and taken it to be additional evidence of discrimination, retaliation and a hostile work environment.

The jury might have drawn similar conclusions concerning Wirshing's treatment of Raquel Bermudez. Like Concepcion, Bermudez had at one time been commended by Wirshing. Also like Concepcion, Bermudez was friendly with Orr. On July 28, 2000, Wirshing offered Bermudez a position with the U.S. Marshals Service (she had been a task force member employed by the Puerto Rico Police). Then shortly thereafter, although she had passed her background check, Wirshing withdrew the offer without an explanation. He also removed her from the task force altogether

in 2001 and provided no explanation for her removal.  Bermudez understood that the sudden withdrawal of the offer and eventual removal from the task force were related to her friendship with Orr.  The jury could have drawn the same conclusion, providing it with additional evidence of discrimination, retaliation, and a hostile work environment.[1]

Orr testified that Wirshing refused to speak with him following his return from the Virgin Islands.  He was also not permitted to serve as Acting Chief Deputy while Wirshing was out of the office, even though he had the second highest permanent rank in the office.  He was also never again allowed to participate in the decision-making for the fugitive task force that he initially ran.[2] Orr left Puerto Rico for Wisconsin on January 26, 2001.

--------

[1] Wirshing testified that he had received a phone call from someone in the Internal Affairs Unit of the Puerto Rico Police and that in that phone call he was told that both Concepcion and Bermudez were under investigation.  He said that he simultaneously removed both officers from the task force because of this phone call.   This testimony is troublesome because Concepcion and Bermudez were actually removed from the task force months apart from each other and because they both deny that they were ever investigated by Internal Affairs.  They explained that if they had been under investigation, then they would have been required to turn in their firearms, and they were never asked to do so.   The jury was entitled to disbelieve Wirshing's testimony and to credit Concepcion and Bermudez's testimony as to why Wirshing removed them from the fugitive task force.

[2] Orr testified that he personally suffered and felt hurt by the treatment that he and those perceived to be his friends received at the hands of Wirshing and Donato.   The Court reviews this testimony in the following section discussing remittitur.

**10. The posting and subsequent cancellation of the second vacancy announcement**

The U.S. Marshals Service posted the second vacancy announcement for the permanent Chief Deputy, GS-15 position, on March 24, 2000. The posting was scheduled to close on May 2, 2000. The same two candidates, Orr and Armstrong, emerged on the certified candidate list. After the Human Resources department generated the certified candidate list, nothing occurred with the posting until February 13, 2001, when it was cancelled, only to be reopened a third time just two days later, on February 15, 2001. Although the defendant stipulated to the fact that Wirshing sought the cancellation of the second posting, Wirshing himself testified that he could not remember if he did so or not.

During the pendency of the third posting, Donato finally achieved the time in grade GS-14 to qualify to apply for the permanent Chief Deputy position. He did so with the backing of Wirshing, who on March 8, 2001, gave Donato a supervisory reference check. Not only that, but in 2002 Wirshing wrote a memorandum to Katherine Mohan in which he further stated his support for Donato's candidacy and stated that selecting any other candidate would not be considered favorably by him. Despite the fact that Donato eventually left the U.S. Marshals Service for reasons not entirely elucidated on the record before the Court, the jury could have inferred that Wirshing stridently pushed Donato's candidacy because he favored Puerto Ricans over non-Puerto Ricans. The jury was also

entitled to infer that Wirshing's requested the cancellation of the second posting because of his animus towards non-Puerto Ricans, and to allow Donato to achieve the time in grade needed to apply for the permanent Chief Deputy position, in that way shutting Orr out of the position, even if he applied.

In sum, the Court finds that the record contains more than sufficient evidence of discrimination to permit a reasonable jury to conclude that the defendant did not appoint Orr to the Chief Deputy GS-15 position after its second listing because of unlawful national origin discrimination.  The Court also finds that the record contains more than sufficient evidence to permit a reasonable jury to have found that in cancelling the second Chief Deputy GS-15 position, defendant retaliated against Orr for filing his EEO complaint.

## C.   The Retaliation Claim

An employer may not retaliate against an employee for initiating an action under Title VII. 42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation, a plaintiff must prove by a preponderance of the evidence that (1) he engaged in protected conduct under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity.  Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003); Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998).  "An allegedly retaliatory act must rise to

some level of substantiality before it can be actionable."
Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005) (citing
Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir.
1998)). The scope of the anti-retaliation provision of Title VII,
unlike the anti-discrimination provision, "extends beyond
workplace-related or employment-related retaliatory acts and harm."
Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006).

        Defendant argues that Orr failed to present evidence that
he suffered from an adverse employment action (to satisfy the
second element of the *prima facie* test). In doing so, defendant
unfortunately revisits an issue which the Court decided prior to
trial when it held that the repeated cancellation of a job posting
after the same candidate applied twice is a sufficient basis for
alleging an adverse employment action. (See Docket No. 101,
pp. 31-34) This holding makes it unnecessary for the Court to
determine whether any of the several forms of mistreatment suffered
by Orr subsequent to his filing of the EEO complaint may in and of
themselves constitute a form of adverse employment action. See
Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68-70 (explaining
that work place behavior that may be trivial and non-actionable in
one circumstance could deter an employee from complaining about
discrimination and therefore be actionable in other circumstances).
The Court notes, however, that Orr presented sufficient evidence
for the jury to find that Wirshing and Donato orchestrated a

hostile work environment against Orr as a form of retaliation for filing the EEO complaint.

The causal link between these adverse employment actions and Orr's filing of the EEO complaint (the protected activity under the retaliation jurisprudence) is provided by Jimenez's testimony that Wirshing told him that Orr had filed the EEO complaint against him and that he was a "fucker" for doing so.  Further inferences in favor of finding a retaliatory motive can be drawn from the testimony that both Wirshing and Donato directed Orr not to speak to anyone else at work about his EEO complaint.  The timing of the events orchestrated against Orr is also relevant: he filed the EEO complaint in March and returned to Puerto Rico from the Virgin Islands later that same month.  Immediately upon returning to Puerto Rico he was subject to the various indignities perpetrated by Wirshing and Donato that were previously described.  The proximity in time between the filing of the complaint and Orr's mistreatment provides additional proof of causation to satisfy the third element of the *prima facie* test for retaliation. <u>See</u> <u>Calero-Cerezo v. U.S. Dept. of Justice</u>, 355 F.3d 6, 25-26 (1st Cir. 2004) (the passage of a month between the date that a defendant becomes aware that an EEO complaint was filed and the advent of an adverse employment action is sufficient temporal proximity to establish a causal connection).  No more evidence is required; plaintiff produced adequate proof to allow a reasonable jury to determine

that the defendant retaliated against him for filing the EEO
complaint.

       D.    **The Hostile Work Environment Claim**

              To prove a hostile work environment, a plaintiff must
show that he was subjected to severe or pervasive harassment that
materially altered the conditions of his employment.  Faragher v.
City of Boca Raton, 524 U.S. 775 (1998) (citing Meritor Savings
Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (additional citation
omitted)).   The harassment must be both objectively and
subjectively offensive such that a reasonable person would find it
hostile or abusive, and the victim must also perceive the conduct
in question to be hostile or abusive.  Faragher, 524 U.S. at 787
(citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22
(1993)).  There is no "mathematically precise test" for determining
if conduct reaches the threshold of being so severe or pervasive
that it creates a work environment abusive to employees.  Harris,
510 U.S. at 22-23.  To determine if a reasonable person would find
a work environment hostile or abusive, a court must consider the
totality of the circumstances.  Id. at 23.  "These may include the
frequency of the discriminatory conduct; its severity; whether it
is physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with an
employee's work performance."  Id.  "The thrust of this inquiry is
to distinguish between the ordinary, if occasionally unpleasant,

vicissitudes of the workplace and actual harassment." Noviello,
398 F.3d at 92 (citation omitted). For example, "'simple teasing,'
offhand comments, and isolated incidents (unless extremely serious)
will not amount to discriminatory changes in the 'terms and
conditions of employment.'" Faragher, 524 U.S. at 788 (citing
Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82
(1998).

      As summarized by the First Circuit Court of Appeals, to
succeed on a hostile work environment claim a plaintiff must prove:
(1) that he is a member of a protected class; (2) that he was
subjected to unwelcome harassment; (3) that the harassment was
based on his membership in a protected class; (4) that the
harassment was sufficiently severe or pervasive so as to alter the
conditions of his employment and create an abusive work
environment; (5) that the objectionable conduct was objectively and
subjectively offensive, such that a reasonable person would find it
hostile or abusive and the victim in fact did perceive it to be so;
and (6) that some basis for employer liability has been
established. Torres-Negron v. Merck & Co., 488 F.3d 34, 39-40 (1st
Cir. 2007); Douglas, 474 F.3d at 15; O'Rourke v. City of
Providence, 235 F.3d 713, 728 (1st Cir. 2001).

      Defendant's reply brief challenges, for the first time,
that part of the jury's verdict in which it found that the
defendant had subjected Orr to a hostile work environment based on

his national origin.  Defendant only challenges whether Orr satisfied the third element of a claim, by claiming that Orr did not sufficiently link the hostile work environment to his national origin.  As with defendant's challenge to the discrimination and retaliation claims, defendant attempts to show that there was no link between the hostile work environment and Orr's national origin by focusing on selective evidence.  Defendant argues that Orr relies upon testimony that the word "gringo" was used often around the office and particularly by Wirshing and Donato who said "fucking gringo."  Defendant suggests that because Orr was not physically present to hear this language being used and because at times it was directed towards other continental Americans, there is insufficient evidence for the jury to have found that the hostile work environment was premised upon national origin discrimination. Defendant seems to be confusing cause and effect.

Frequent use of the term "gringo" alone may not be sufficient to establish a hostile work environment claim.  Frequent use of the term "gringo" is sufficient, however, to tie an otherwise hostile work environment to a perpetrator's discriminatory animus based upon national origin especially where, as here, the supervisory officials referred to the plaintiff as a "fucking gringo."  That, however, is not the only evidence linking the hostile work environment to a national-origin-based animus.  As the defendant noted, various witnesses testified that Wirshing said

he would only promote Puerto Ricans in the March 9, 2000 meeting. It is not of great importance that Wirshing did not specifically name Orr as someone who would not be promoted.  Wirshing's statements and his staunch support for Donato are sufficient to link the subsequent hostile work environment to Orr's national origin.  Even if it were not, Donato's actions in approaching various task force members and asking if they were on the Puerto Rican team or the American team also provides strong evidence that the hostile work environment was premised upon Orr's national origin.  On the whole, there is a surfeit of evidence from which a reasonable jury could infer that the hostile work environment related to Orr's national origin.

    **E.   Conclusion**

        Orr provided more than sufficient circumstantial evidence to permit the jury to (1) determine that the defendant intentionally discriminated against Orr when the U.S. Marshals Service cancelled the listing for the Chief Deputy position; (2) determine that the defendant intentionally discriminated against Orr by creating a hostile work environment; (3) determine that the defendant retaliated against Orr by denying him a promotion to the GS-15 Chief Deputy Marshal position subsequent to Orr's filing of an EEO complaint; and (4) determine that the defendant intentionally retaliated against Orr by creating a hostile work

environment subsequent to Orr's filing of the EEO complaint. Therefore the Court **DENIES** defendant's Rule 50 motion.

## II. Remittitur or new trial on damages

The jury awarded Orr $1,350,000.00 in compensatory damages for his past, present and future emotional pain and mental anguish caused by defendant's intentional discrimination, retaliation and maintenance of a hostile work environment. (See Docket No. 121) The parties agree that this award must be reduced to $300,000.00, pursuant to the cap on damages in cases of intentional discrimination in employment contained the Civil Rights Act of 1991. 42 U.S.C. § 1981a(b)(3)(D). The parties disagree, however, as to whether remittitur to an amount below $300,000.00 is appropriate in this case. The Court finds that it is not.

Although "notoriously difficult to quantify, noneconomic damages such as pain and suffering and loss of enjoyment of life, are not immune" from review. Havigna v. Crowley Towing and Transp. Co., 24 F.3d 1480, 1484 (1st Cir. 1994) (citations omitted); see also Koster v. Trans World Airlines, Inc., 181 F.3d 24, 34 (1st Cir. 1999) (citation omitted). A party requesting remittitur "bears the heavy burden of establishing that an award is grossly excessive, inordinate, shocking to the conscience of the court or so high that it would be a denial of justice to permit it to stand." Havigna, 24 F.3d at 1484. A reviewing court will not "disturb an award of damages because it is extremely generous or

because [the court] think[s] the damages are considerably less."
Koster, 181 F.3d at 34.  Rather, the court will "adhere to the
jury's judgment unless the damages awarded are 'so grossly
disproportionate to any injury established by the evidence as to be
unconscionable as a matter of law.'"   Tobin v. Liberty Mut. Ins.
Co., 553 F.3d 121, 144 (1st Cir. 2009) (quoting Koster, 181 F.3d at
34).

        Although generous, Orr's reduced compensatory damages award of
$300,000.00 is not so high as to be grossly disproportionate to the
evidence of damages in this case.  In general terms, Orr testified
that he felt hopeless, fearful, belittled, humiliated, demeaned,
and helpless.  These feelings, and the daily abuse that he suffered
at the hands of Wirshing and Donato, continued for many months,
from the time that he returned from the Virgin Islands up until the
time that he left Puerto Rico for Wisconsin.  Even years later,
when Orr testified at trial in June and July of 2008, he became
visibly upset and emotional while he was on the stand.

        Specifically, Orr testified that he learned of the comments
that Wirshing and Donato made at the March 9 task force meeting
while he was still on detail in the Virgin Islands.  Upon hearing
that Wirshing and Donato planned only to promote Puerto Ricans, Orr
felt hopeless.  He feared that he would never be promoted to GS-15
and he worried that life would become difficult for the task force
members.  He testified that various colleagues, including one as

far away as Iowa, warned him that he should "watch out" when he returned to Puerto Rico.  He further testified that on March 27, 2000 Wirshing told him that he "belong[s]" to the Virgin Islands, a comment that Orr understood to mean that he was not part of the District of Puerto Rico team.

That same day, the day Orr returned to the District of Puerto Rico, Wirshing assigned Orr to monitor the cell block and he assigned him the worst car in the fleet, one that Orr described alternately as "junk" and as a "death trap."  Orr said that these assignments humiliated him in front of his troops.  He was supposed to be a leader of the fugitive task force, and instead he felt belittled and helpless assigned to the cell block.  Orr said that a fellow Deputy U.S. Marshal saw him in a dejected and depressed state when sitting in a cubicle.  This deputy asked Orr how he felt.  This lead Orr to seek privacy in the car he had been assigned where he broke down and cried.  He testified that the hostility he felt made him feel "put down," "slammed" and as if he were "very little and nothing."  Orr explained that he felt like he had been punished for playing by the rules and that Wirshing had manipulated the system to take advantage of him.  Sanchez, for example, testified that Orr told her that he felt as if he had been "set up" so that Wirshing could bypass him in favor of Donato.

Orr testified that he was excluded from meetings in which he should have participated.  He added that Wirshing refused to speak

to him outside of those meetings that he was allowed to attend.
Orr heard that Donato compared task force members who were
supportive of Orr to snitches and those who were not as if they
were members of the most powerful prison gang in Puerto Rico.  He
testified that anyone associated with him was harassed.   This
behavior towards him and those around him made Orr feel powerless,
and like "poison."  One petty example of the internal friction he
faced is that Donato once waited a week to sign off on a request
for special funding that Orr submitted to provide protection to an
Assistant United States Attorney, making Orr look bad and creating
a safety hazard for that public servant.

More significant examples of the hostile environment can be
drawn from the harmful personnel decisions taken against task force
members who were close to Orr.  When Jose Concepcion was removed
from the Fugitive Task Force in the fall of 2000, Orr apologized to
him because he believed that Wirshing had fired Concepcion because
of his association with Orr.  He also apologized to Raquel Bermudez
when the offer to become a U.S. Marshals Service detention officer
was suddenly withdrawn, because he believed that she too was
rejected because Wirshing associated her with Orr.  He was so
distraught that he cried in front of Bermudez.  Orr also testified
that Donato threatened to remove Andres Jimenez from the task
force, although he did not carry through on that threat.

In addition, throughout the year 2000, Orr was aware that he was referred to as "fucking gringo" and "gringo maricon" ("gringo fag").  He testified that between the summer of 2000 and January 2001, when he left Puerto Rico, he attended four sessions with a therapist.

By January 2001, Orr said that he had been under stress for many months and that he could not handle the hostile environment any longer.  In order to escape this environment, he accepted a downgrade in position, to GS-13, in order to transfer to Wisconsin. Orr became visibly emotional on the stand when discussing his departure from Puerto Rico.

Defendant argues that despite the aforementioned evidence of damages, plaintiff's award should be lowered much like the award in Koster was lowered, in part because of a lack of expert testimony from a mental health expert.  Koster, 181 F.3d at 35 (noting that although testimony from a mental health expert is not necessary to sustain an award for emotional distress, the absence of such evidence is useful in comparing the injury to the award of damages).  The amount of the award granted in Koster after remittitur, $250,000.00, however, does not indicate that an award of $300,000.00 would be unconscionable as a matter of law even without expert testimony.  In fact, it is in line with other awards that have fairly recently passed review by the First Circuit Court of Appeals.  For example, in McDonough, a Title VII retaliation

case, the jury awarded the plaintiff $300,000.00 in damages.
McDonough v. City of Quincy, 452 F.3d 8, 22 (1st Cir. 2006).  The
damages that of which plaintiff testified in McDonough consisted of
substantial humiliation and damage to his reputation.  Id.  The
plaintiff added that his relationship with his family deteriorated
such that he became easily enraged at his grandchildren, and that
he made his wife and sisters cry.  Id.  He too cried on occasion.
Id.

In Monteagudo, a sexual harassment case, the First Circuit
Court of Appeals upheld a jury award of $333,000.00 in compensatory
damages pursuant to Title VII and certain Puerto Rico laws.
Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de
Puerto Rico, 554 F.3d 164, 174-75 (1st Cir. 2009).  The plaintiff
there testified that she endured sexual harassment for several
months, making her weep every evening and feel "like a piece of
meat."  Id. at 175.  The plaintiff also testified that after her
constructive discharge, she suffered from depression and an
inability to sleep.  Id.

The evidence of damages presented by Orr and the damages award
(after application of the statutory cap) are comparable to the
evidence of damages and verdicts awarded in McDonough and
Monteagudo.  All three of these awards are roughly in line with
other First Circuit precedent as well.  See Valentin-Almeyda v.
Municipality of Aguadilla, 447 F.3d 85, 102-03 (1st Cir. 2006)

(upholding an award of $705,000.00 where there was evidence of "serious economic damages" and where the plaintiff "suffered from various forms of emotional damages and mental anguish, including, *inter alia*, insomnia, anxiety, guilt, and depression."); Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 63-64 (1st Cir. 2005) (upholding a $250,000.00 damages award in a gender-motivated discharge case based upon plaintiff's own testimony where plaintiff testified that her life changed drastically, she entered a deep depression that lasted "for quite some time," her marriage suffered, and she had trouble finding subsequent employment); Hogan v. Bangor & Aroostook R.R., 61 F.3d 1034, 1037-38 (1st Cir. 1995) (reinstating a compensatory damage award of $200,000.00--the maximum allowable under the damages cap--for emotional distress, inconvenience, mental anguish and loss of enjoyment of life in an ADEA case). Moreover, contrary to defendant's suggestion, the damages award cap of $300,000.00 pursuant to 42 U.S.C. § 1981a(b)(3) is not reserved for cases of only extreme emotional distress. McDonough, 452 F.3d at 22 n.7. Therefore, the Court **DENIES** defendant's motion for remittitur or in lieu of it, a new trial. The Court will not direct that the compensatory damages award be lowered beyond the maximum of $300,000.00 allowed pursuant to 42 U.S.C. § 1981a(b)(3).

Plaintiff's motion for reconsideration of the court's second extension of time to file the motion for remittitur and plaintiff's

motion to strike are **DENIED** as **MOOT**, as is defendant's motion to amend his reply brief.

### III. Equitable Relief

"The remedial scheme in Title VII is designed to make a plaintiff who has been the victim of discrimination whole through the use of equitable remedies." Selgas v. American Airlines, Inc., 104 F.3d 9, 12 (1st Cir. 1997) (citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975)). "These remedies (which include reinstatement, back pay, and front pay) are accordingly intended to compensate a plaintiff for the effects of the discrimination, both past and future, and to bring the plaintiff to the position which [he] would have occupied but for the illegal act(s)." Id. (citation omitted). In evaluating a plaintiff's request for equitable relief, a court must be guided by Title VII's two primary purposes: (1) the creation and maintenance of a "level, discrimination-free playing field" and (2) the complete recovery from injury by a victim of unlawful discrimination. Lussier v. Runyon, 50 F.3d 1103, 1111 (1st Cir. 1995); see also Albemarle Paper Co., 422 U.S. at 421.

Orr has requested both back pay and reinstatement. A prevailing Title VII plaintiff is presumptively entitled to back pay. Lussier, 50 F.3d at 1110 n.7. As long as the claimant has made some effort to secure other employment, the burden to prove failure to mitigate normally resides with the defendant-employer,

which must show that although a substantially equivalent job was available in the relevant geographic area, the claimant failed to use reasonable diligence to secure such a job.  Quint v. A.E. Staley Manuf. Co., 172 F.3d 1, 16 (1st Cir. 1999); Carey v. Mt. Desert Island Hosp., 156 F.3d 31, 41 (1st Cir. 1998).  In the rare case where the employer shows that a claimant has "remained completely idle" following the challenged employment action, however, the employer need not prove the existence of substantially equivalent positions.  Quint, 172 F.3d at 16.

The defendant argues that Orr failed to apply for another GS-15 position subsequent to the closing of the second posting for the Chief Deputy GS-15 position in Puerto Rico.  This argument fails because it completely disregards the evidence that Orr did in fact seek out and accept other employment; he did not rest on his laurels.  During the long period between the date that the Chief Deputy position was posted and when it was finally cancelled, Orr left Puerto Rico to accept a GS-13 position in Wisconsin ostensibly to escape the discriminatory environment that he faced in Puerto Rico.  After accepting the position with the U.S. Marshals Service in Wisconsin, Orr later sought out and accepted a position with the Air Marshals[3] that pays nearly what he would have received as a GS-14.  Thus, the burden remains on the defendant to show that

---

[3] Orr testified that the Air Marshals are not part of the U.S. Marshals Service.

substantially equivalent jobs were available in the relevant geographic area.  The defendant produced no evidence during the pendency of this case showing that there were any substantially equivalent jobs available in Puerto Rico with the U.S. Marshals Service, or even anywhere else in the United States.[4]  Therefore, the defendant has not overcome the presumption favoring back pay.

Although there is not a so-called presumption to reinstatement in the First Circuit Court of Appeals, there is an "overarching preference" for it, given that it "most efficiently" advances the twin goals of Title VII.  Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 43 (1st Cir. 2003) (citations omitted); compare with e.g., U.S. E.E.O.C. v. W&O, Inc., 213 F.3d 600, 619 (11th Cir. 2000) ("prevailing Title VII plaintiffs are presumptively entitled to either reinstatement or front pay") (citation omitted).  "[E]quitable considerations different in kind or degree from those regularly accompanying reinstatement must be present" for a court to deny reinstatement.  Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 323 (1st Cir. 1989) (discussing reinstatement in the context of a First Amendment claim brought pursuant to section 1983).  Factors relevant to determining if a plaintiff should be reinstated include:  (1) the strength of the evidence proving employment

---

[4] At trial, defense counsel asked Orr what other positions he had applied for and also asked him if his law degree might qualify him for law related GS-14 and GS-15 positions in the federal government.  Evidence was not presented regarding other openings.

discrimination; (2) whether the discharged employee found comparable work; (3) the absence of a property right in the position because the employee was hired in violation of local law; and (4) the ineligibility of the employee for the position, due to failure to meet established qualifications, which would permit immediate discharge for no reason or for any permissible reason. Che, 342 F.3d at 43 n.1 (citing Velazquez v. Figueroa-Gomez, 996 F.2d 425, 429 (1st Cir. 1993)). These factors all suggest that the Court should order reinstatement. First, the evidence in this case was strong enough to support three different types of Title VII claims, and in making his case, Orr showed that the discriminatory environment affected many others, not just himself. Second, although Orr found a job as an Air Marshal in which he earned nearly what he earned as a GS-14 Assistant Chief Deputy U.S. Marshal, he is not at the GS-15 pay scale and he has no supervisory authority as he initially did in the District of Puerto Rico. Third, there is no suggestion in the record that Orr was hired in violation of local law. Fourth, Mohan testified that Orr qualified for the GS-15 position and there is no evidence in the record to contradict Mohan's testimony.

Lastly, although it is not one of the aforementioned factors, the possibility that coworker hostility could burden government operations might under some circumstances also provide a basis for not ordering reinstatement. Che, 342 F.3d at 43-44; see Quint, 172

F.3d at 21.  There is no evidence to suggest that any hostility persists against Orr in the District of Puerto Rico or anywhere else in the U.S. Marshals Service, however, given that Wirshing and Donato are no longer with the Service and they were the architects of the discriminatory environment directed against Orr.  Therefore, the Court orders the defendant to **REINSTATE** Orr to duty in the U.S. Marshals Service at a GS-15 position **no later than July 27, 2009**. The Court also orders the parties to confer in an attempt to find a mutually agreeable position for Orr to occupy within the U.S. Marshals Service if the Chief Deputy position in the District of Puerto Rico is occupied.  If the parties are unable to agree on a position then the defendant may petition the Court no later than July 17, 2009 for a hearing on the issue of front pay in lieu of reinstatement.

The Court also orders the defendant to pay Orr the back pay he is due; to pay the correct amount into Orr's thrift saving's plan account to cover the matching payments that Orr would have been eligible to receive at the GS-15 grade level, and to make Orr's appointment to GS-15 retroactive to May 3, 2001 for the purpose of calculating Orr's FERS annuity.  The Court also exercises its

discretion to award Orr prejudgment interest calculated at 2.25%

annually.[5]

## IV. Attorney Fees

Orr has filed a motion requesting that the Court exercise its

discretion to award him attorneys' fees and costs as the prevailing

party in this matter.   Rather than oppose Orr's motion on the

merits, the defendant argues that Orr's motion for attorney fees

---

[5] Courts may exercise their discretion to award prejudgment
interest on back pay to make whole a Title VII plaintiff.  See
Loeffler v. Frank, 486 U.S. 549, 557-58 (1988); Conway v. Electro
Switch Corp., 825 F.2d 593, 602 (1st Cir. 1987).  Awards of pre-
and post-judgment interest may be granted against the United
States. 42 U.S.C. § 2000e-16(d); see, e.g., Estate of Reynolds v.
Martin, 985 F.2d 470, 472 (9th Cir. 1993).  Because Title VII-like
some other federal statutes-is silent with respect to interest
rates, the court has "discretion to select an appropriate rate,"
and may "look to outside sources, including state law, for
guidance." Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d
220, 224-25 (1st Cir. 1996) (discussing a trial court's discretion
to select a prejudgment interest rate in an ERISA case); see also
Conway, 825 F.2d at 602.  Courts typically look to either the
federal (post) judgment rate contained in 28 U.S.C. § 1961, or to
state law interest rates for an appropriate rate.  See, e.g.,
Conetta v. National Hair Care Centers, Inc., 236 F.3d 67, 77-78
(1st Cir. 2001) (noting that where a plaintiff wins on a Title VII
and a state law claim that completely overlap with each other and
a state law interest rate is mandated for the state law claim then
the court must apply the state law rate); Cottrill, 100 F.3d at 225
(federal statutory rate); Freeman v. Package Mach. Co., 865 F.2d
1331, 1343 (1st Cir. 1988) (state law rate).  Orr requests
prejudgment interest of 4% on his back pay but does not explain why
4% would be appropriate in this case.  The defendant does not
address the issue.  Rather than selecting Orr's proffered 4%
figure, the Court chooses the federal post-judgment rate contained
in 28 U.S.C. § 1961.  The Court also takes judicial notice of the
fact that for the week prior to the entry of judgment in this case
the rate was 2.25%.

and costs is premature pursuant to Local Rule of Civil
Procedure 54.  This rule provides as follows:

> An application for attorneys' fees in those cases in
> which fees have been contracted for or in any case in
> which no notice of appeal has been filed shall be filed
> within forty-five days of entry of judgment.
>
> An application for fees in all other cases shall be filed
> within thirty days of the disposition of the appeal.  A
> claim for fees filed before the final disposition of any
> appeal shall have no effect and a new application must be
> filed within the time prescribed herein.

Loc.Civ.R. 54.

The defendant argues that Orr's motion cannot be decided while
the defendant still has the opportunity to file his appeal.  The
Court reluctantly agrees with the defendant.

Orr correctly argues that in order to ensure that he would be
able to pursue attorney fees he was obligated to file his request
for attorney fees within forty five days of the entry of judgment
because the defendant had not yet filed a notice of appeal.  Orr
goes on to argue that the authors of the local rule must have
intended to permit the adjudication of an attorneys' fees motion
despite a pending appeal or the possibility that an appeal would be
filed.  Otherwise, Orr argues, the authors would not have allowed
the filing of a motion for attorneys' fees until the date when the
time for an appeal expires.  While the Court sees some merit in
this argument, it nonetheless disagrees with Orr's position because
it necessarily leaves without meaning the last sentence of the
rule.  That sentence directs that claims for fees filed before the

final disposition of any appeal shall have no effect and it requires a new application for fees once the Court of Appeals disposes of the appeal. This sentence read at face value voids any application for fees filed within forty five days of judgment. If the court allowed the first sentence to trump the third, however, then it would create a perverse incentive for a prevailing party to race to file an application for fees before the losing party files its notice of appeal. It would also undermine one of the apparent purposes of the rule, ensuring that a trial court does not rule on a request for an award of attorneys' fees until after the Court of Appeals decides any challenges to the underlying claims.

The case cited by Orr in favor of his position, Reyes Cañada v. Rey Hernandez, 411 F.Supp.2d 53, 55 (2006), actually undermines his argument. In Reyes Cañada, the section 1983 plaintiffs filed an attorneys' fees application within forty five days of judgment and at a time when no notice of appeal had yet been filed. Id. An appeal, however, was subsequently filed. Id. The Reyes Cañada court decided to adjudicate the motion for fees despite the pending appeal, in contravention of Local Rule 54. Id. Citing Garcia-Goyco v. Law Environmental Consultants, Inc., 428 F.3d 14, 20 (1st Cir. 2005) for the proposition that a district court may depart from its own local rules if there is "sound reason for the departure and no party's substantial rights have been unfairly jeopardized," the Reyes Cañada court held that the United States

Supreme Court's preference for deciding section 1988 fee awards alongside section 1983 appeals provided sound reason for not applying Local Rule 54. Id. This case, of course, arises pursuant to Title VII, not 42 U.S.C. § 1983, and thus 42 U.S.C. § 2000e-5(k) provides the basis for awarding attorneys' fees, not 42 U.S.C. § 1988. See Arvinger v. Mayor and City Council of Baltimore, 31 F.3d 196, 200 (4th Cir. 1994). Thus the Reyes Cañada court's rationale for nullifying the last sentence of Local Rule 54 does not apply here. Therefore, the Court **DENIES** Orr's application for attorneys' fees and costs **WITHOUT PREJUDICE.** Instead, the Court invites Orr to submit a new application for attorneys' fees no later than thirty days after the disposition of an appeal in this case (if he prevails), or if no appeal is filed following the Court's disposition of the defendant's Rule 50 motion, then within thirty days of the date on which the defendant's right to appeal expires.

## V.   Conclusion

For the reasons expressed above, the Court finds that the defendant violated plaintiff Michael Orr's right to be free from national origin discrimination in the work place by denying him a promotion to the GS-15 Chief Deputy Marshal position; that the defendant violated plaintiff Michael Orr's right to be free from national origin discrimination in the work place by subjecting him to a hostile work environment; that the defendant retaliated against plaintiff Michael Orr for filing an EEO complaint by

denying him a promotion to the GS-15 Chief Deputy Marshal position; and that the defendant retaliated against plaintiff Michael Orr for filing an EEO complaint by subjecting him to a hostile work environment.

In addition, the Court hereby **DENIES WITH PREJUDICE** defendant's Rule 50 motion (Docket No. 128); **DENIES WITH PREJUDICE** defendant's motion for a remittitur (Docket No. 138); **ORDERS** the reduction of the jury's compensatory damages award to $300,000.00 pursuant to 42 U.S.C. § 1981a(b)(3)(D); **GRANTS** Orr's motion for equitable relief and awards him back pay and matching payments to be paid into Orr's thrift savings plan (Docket No. 127); **GRANTS** Orr prejudgment interest on the back pay award at the rate of 2.25%; **ORDERS** the defendant to **reinstate** Orr at the **GS-15 level** retroactive to May 3, 2001 **no later than July 27, 2009** in a position mutually agreed upon by the defendant and Orr; **ORDERS** the parties to submit the amount of back pay due Orr, the pre-judgment interest due him on the back-pay amount, and the amount of matching payments due to be made into Orr's thrift savings account; **DENIES** as **MOOT** Orr's motion to reconsider the Court's grant of an enlargement of time to file a motion for remittitur (Docket No. 136); **DENIES** as **MOOT** Orr's motion to strike the defendant's motion for remittitur (Docket No. 179); **DENIES** as **MOOT** defendant's

Civil No. 06-1775 (FAB)                                                    44

request to amend its reply brief (Docket No. 180); and **DENIES**

**WITHOUT PREJUDICE** Orr's motion for attorney fees.  (Docket No. 139)

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, July 7, 2009.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE